## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

TABITHA BRENNAN,                         )
                                         )
                    Plaintiff,           )
vs.                                      )         NO.  CIV-10-0364-HE
                                         )
STATE FARM MUTUAL AUTOMOBILE )
INSURANCE COMPANY,                       )
                                         )
                    Defendant.           )

## <u>ORDER</u>

     Plaintiff Tabitha Brennan was involved in a vehicle accident with an uninsured motorist.  She subsequently filed this action against her insurer, State Farm Mutual Automobile Insurance Company ("State Farm"), alleging that State Farm breached its duty of good faith and fair dealing in conjunction with its handling of her claims for uninsured motorist ("UM") coverage and property damage.  Plaintiff is not asserting a breach of contract claim against defendant.  Both parties have moved for summary judgment, which is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).[1]  After reviewing the parties' briefs and exhibits, the court concludes defendant's motion should be granted and plaintiff's denied.[2]  Most of the facts pertinent to disposition of the parties' motion are undisputed, although involved and sometimes convoluted.  Where a dispute exists

-------------------------------------

    [1]*Plaintiff's motion is limited to requesting a determination of certain facts, but does not request judgment on any claim.*

    [2]*In this order the court has combined the parties' arguments from the briefs filed either in support of their own motion for summary judgment or in response to their opponent's.*

as to a material fact, that is noted in the following discussion.

Background

On August 17, 2009, State Farm issued a policy insuring plaintiff's 1998 Lexus. The policy, as initially issued, did not include UM coverage.[3] Defendant's Exhibit 2. State Farm also provided liability coverage for plaintiff's Chevy Cobalt. Plaintiff had rejected UM on that vehicle in writing on April, 9, 2007, as contemplated by Oklahoma law. Defendant's Exhibit 1.

On November 20, 2009, State Farm sent a letter to plaintiff at 9300 Orchard Blvd., Apt. 704, Midwest City. The letter advised her that UM coverage would be added to the Lexus policy because plaintiff had not returned the required UM coverage selection/rejection form. Defendant asserts that was plaintiff's last known address, which plaintiff disputes. Plaintiff testified that her brother lived at the 9300 Orchard Blvd. address and that she never lived there and never provided that address to State Farm. Her brother testified that he did not receive mail for plaintiff at that address before the date of her accident.

Defendant's claim file indicates that in August, 2009, plaintiff requested an address change and then switched her address twice more within a brief period of time. In the process of updating plaintiff's address, a staff person erroneously changed it to that of her brother, who had separate policies with the same insurance agent. Defendant's Exhibit 12,

_____

[3]*Plaintiff asserts that on February 1, 2010 and July 12, 2010, defendant issued declaration pages to plaintiff confirming UM coverage on the Lexus. The documents she relies on, plaintiff's Exhibits 54, 60 and 61, pertain to coverage periods* **after** *the date of the collision (February 17 - August 17, 2010 and August 17, 2010 - February 17, 2011). They do not establish that plaintiff had UM coverage on the critical date, January 15, 2010.*

SF-0008. Plaintiff received two payment receipts in November and December, 2009, which listed her address as 9300 Orchard Blvd. *See* defendant's Exhibit 6.

State Farm sent plaintiff a post card on December 3, 2009, informing her that her policies were about to cancel, which plaintiff denies receiving. The next day, December 4, State Farm mailed a cancellation notice to plaintiff using the 9300 Orchard Blvd. address. The notice stated that coverage on both the Lexus and Cobalt would expire on December 17, 2009, unless plaintiff paid $447.62. The notice also stated that it was the only cancellation notice plaintiff would receive and "[b]ecause several of your payments have been late or partial, we are discontinuing your payment plan. We must receive the full amount due by the due date to continue your coverage. Please allow for mail time." Defendant's Exhibit 5. While plaintiff denies receiving the cancellation notice,[4] she does not dispute that she went into State Farm's office on December 8, 2009, and made a payment of $108.00. The 12/08/09 entry in defendant's records reflecting that visit states:

> Insured came in about cancellation letter. I told her we needed to collect the 447.62. She started crying, her [sic] she had to pay for her boyfriend to get out of jail for child support, she couldn't even pay rent, and didn't have enough to pay the full amount. She argued it should not be that amount because of MCD was not added to her policy. I told her we must collect the full amount and if there was credit it would be on the next months billing. She said she would have to come in January to catch up.

Defendant's Exhibit 4. Plaintiff contends she paid the amount due. She claims State Farm

---

[4] *Plaintiff asserts that the address on the cancellation notice, defendant's Exhibit 5, is invalid as it does not include an apartment number. She states that her brother "has never received any mail without the apartment number stated." Plaintiff's response, p. 6. However, the cited deposition testimony (Jeremy Brennan's depo., p. 16, lines 6-18) does not substantiate her statement.*

had previously overcharged her and that $108 was all that was owed.

On December 8, 2009, plaintiff also executed the state mandated form that allows the insured to choose among the different UM coverage options available under Oklahoma law. Defendant's Exhibit 1. The form pertained to UM coverage on plaintiff's Lexus. The form plaintiff signed has a check beside the option declining UM coverage. Plaintiff denies checking that box or authorizing anyone to check it on her behalf. Plaintiff's affidavit. Plaintiff claims defendant's Exhibit 1 "is a fraudulently altered document." *Id.* Plaintiff states she requested UM coverage for the Lexus and was advised by State Farm that she had it on both her vehicles both prior to and after her January, 2010, accident.

Defendant learned of the document's existence in September, 2010. Noelle Whitson, who managed the office of plaintiff's insurance agent, testified that she discovered the rejection form when she started her year-end cleaning. Whitson Depo., p. 26.

On December 14, 2009, State Farm attempted to return plaintiff's $108 December payment to her by mail. The letter sent with the check stated that defendant could not accept partial payments and that the total amount due ($286.18) had to be paid by December 17, 2009, to prevent disruption of coverage. The letter also reminded plaintiff of the previously sent cancellation notice. Defendant's Exhibit 7. Although defendant states the December 14 letter was returned, it appears the cancellation notice, rather than the December 14 letter, may have been returned, as plaintiff testified that she received the $108 check and accompanying letter after the accident when she found out her mail was going to her brother's address. Plaintiff's deposition, p. 300. *See* defendant's Exhibit 12, SF-0012; SF-

0010.

Defendant claims that, even if plaintiff did not receive its December 14, 2009, letter, she was aware that she had to pay more than $108 to keep her policies in force, yet made no other payments. In addition to relying on the various notices it mailed to plaintiff, albeit to the wrong address, defendant also cites plaintiff's visit on 12/08/09 to her agent's office. Defendant's Exhibit 4. Plaintiff denies she had such knowledge, claiming she never received a cancellation notice.

State Farm cancelled the policies on both the Lexus and Cobalt due to nonpayment of premiums on December 17, 2009.[5] At the time of the January 15, 2010, accident, plaintiff had not paid to have coverage reinstated. However, plaintiff did make a payment of $286 on January 22, 2010. Plaintiff's Exhibit 47.

Plaintiff sustained injuries on January 15, 2010, when her vehicle was rear-ended by an uninsured motorist. She obtained a repair estimate from Hudiburg Chevrolet on January 21, 2010, without notice to or input from State Farm. On January 27, 2010, plaintiff's counsel, James Dunn, faxed defendant a letter in which he advised State Farm that he represented plaintiff and gave notice of his attorney's lien, the January 15, 2010, accident "and the possibility of a U.M. claim." Defendant's Exhibit 10. He also stated that "[t]o date, we have not determined the status [of] our client, your insured's, claim." *Id.* The next day Dunn sent plaintiff another fax, which included the letter sent the day before, a vehicle

---

[5]*A question exists as to the validity of the cancellation, due to plaintiff's asserted non-receipt of the notice of cancellation.*

summary with NADA values for plaintiff's Cobalt, insurance verification forms for the Cobalt and Hudiburg Chevrolet's preliminary estimate for repairing the Cobalt.[6]

The vehicle summary provided a NADA base clean retail value of $8,175 with a mileage deduction of $625 and a NADA adjusted clean retail value of $7,550. Hudiburg's estimated grand total cost of repairs was $5076.93. Plaintiff denies this was the total repair cost, citing Hudiburg's disclaimer that "the above is an estimate, based on our inspection, & does not cover additional parts or labor which may be required after work has been opened up. Occasionally, after work has started, worn or damaged parts are discovered which are not evident on first inspection. Quotations on parts & labor are subject to change." Defendant's Exhibit 26. Plaintiff asserts that "[s]uch statement acknowledges that the Hudiburg estimate was not a complete estimate." Plaintiff's response, p. 13. The vehicle summary and Hudiburg repair estimate did not include a salvage value estimate for plaintiff's Cobalt and neither referenced prior unrepaired hail loss damage to plaintiff's car.

Upon receiving Dunn's letter, State Farm identified a coverage question regarding plaintiff's policy on her Cobalt because State Farm's records reflected it had been cancelled due to nonpayment of premiums. Defendant's Exhibit 11, entry no. 14 (1/27/10). Plaintiff "admits a coverage question was started by the Defendant," plaintiff's response p. 8, but denies that her policy was properly cancelled. She claims she "made each and every

_____

[6]*Gail Woods, a State Farm adjuster, wrote Dunn on February 1, 2010, acknowledging his representation of plaintiff in connection with the January 15, 2010, loss. She stated that the claim was currently under investigation and asked him to contact State Farm as soon as possible if he had any information that "may aid in the resolution of this matter." Defendant's Exhibit 13.*

payment corrected and advised by the State Farm agent" because her bills were incorrect each month. *Id.*

As evidence that she was not in arrears, plaintiff has submitted the transcript of her recorded conversations with Noelle Whitson.[7] Plaintiff's Exhibit 43. While Ms. Whitson's telephone remarks indicate there were problems with plaintiff's billing, it is not clear from the transcript whether plaintiff had actually paid all that was owed.[8] When later questioned about her recorded statements and asked, "Now, you don't disagree with what you told her in these two transcripts, do you?, Ms. Whitson testified:

> No. At this point, I was made to believe through Gail that we were going to have her back-pay all that she had owed. There were things within her billing that, as an agent, I did not understand, due to that's done out of Tulsa.
> So by my looking at it, I felt that she – had a case – as long as she went back and paid everything they said was due and she was caught up, that she was going to have coverage. In my conversations with Gail Wood, that's how she made it out to me, that if I could produce something, if we had made a few mistakes here and there, that she would have coverage.
> And that's where – when talking to Tabitha, that the mind process I was in, is that if they're telling me – claims is telling me there's a possibility we're going to give this girl coverage, she's a single mom, she's had numerous problems, I by all means want, as a person, to give her coverage.

Noelle Whitson's Depo., pp. 73-74. She also stated, when asked if plaintiff's bill had been inaccurate since August 2009: "To my belief, yes. But after sitting with Bruce in March, it

---

[7]*Plaintiff secretly recorded the conversations after she retained counsel.*

[8]*Ms. Whitson waffles somewhat during the conversation. E.g. "I did the best I could on that, I mean from talking to her, and just told her, you know, 'It's not a matter of she decided not to pay, its' just a matter of it was never right.' And trying to get it right wasn't, you know – …" Plaintiff's Exhibit 43, p. 9*

was not. I was wrong." *Id.* p. 78. Ms. Whitson explained the basis for the error in her deposition. In August, 2009, plaintiff added the Lexus to her policy and paid the add-on charge but apparently did not pay the August premium. That started what Ms. Whitson referred to as "a snowball of past due." Whitson depo., pp. 79-80.

State Farm then began a coverage investigation, which it contends was limited to a property damage claim for the Cobalt. Plaintiff disputes that State Farm believed that at that time she was only making a property damage claim, citing plaintiff's Exhibit 14, entry no. 31 (1/27/10). The entry states: "Lien letter from Insd atty – making UM claim." The person who made the entry, State Farm adjustor Gail Woods, testified that the entry was incorrect because it did not appear to her that counsel had made a UM claim in his initial letter. Defendant's Exhibit 18. Dunn had referred in his letter to "the possibility of a U.M. claim." Defendant's Exhibit 10.

As part of its investigation, State Farm spoke with Noelle Whitson. She informed defendant of what it characterizes as "potential agency mistakes relating to Plaintiff's requested policy changes." Defendant's motion, p. 6. Ms. Whitson advised that plaintiff had changed her address multiple times in a brief period and, when she asked to have her address switched back to her boyfriend's residence, a staff person mistakenly changed it to her brother's address.[9] Defendant's Exhibit 12, entry no. 42 (2/05/10); Whitson's memorandum, defendant's Exhibit 14, dated 2/03/10. Ms. Woods's recommendation was:

---

[9]*There is a slight insignificant variation between what Ms. Whitson told State Farm and what she put in her memo regarding the reason plaintiff's address was incorrect.*

The cancellation notice was sent to Jeremy Brennan's address, due to error made in the agent's office. Ms. Brennan did not receive the notice of cancellation which was sent 12/4/09, to wrong address, the cancellation notice was returned to State Farm. Insd made a partial payment on 12/8/1-, did not know she was cancelled and that payment was accepted by agency, and then Underwriting refunded the payment of $108. Because it was a partial payment, which agency should not have accepted.

Based on the series of errors, it is recommended that we force coverage for the loss of 1-15-10. The cancellation notice was not sent to the proper address for the named insured.

Defendant's Exhibit 12, entry no. 42 (02/5/10).

On February 5, 2010, Donna Gottman, a State Farm team manager, sent plaintiff, in care of her counsel, a reservation of rights letter, stating: "Company records indicate the policy had been cancelled prior to the date of the accident ... If you have any information or materials which may aid in the analysis of your claim for coverage, please provide it to us as soon as possible." Defendant's Exhibit 15.

Plaintiff then contacted Noelle Whitson. During the telephone conversation, which plaintiff recorded, Ms. Whitson told plaintiff that State Farm was in error, that plaintiff had UM coverage as the policy on the Lexus had not lapsed. Five days later, on February 10, 2010, defendant decided to "force" collision coverage.[10] Gail Woods notified Dunn by telephone that State Farm would provide collision coverage for the Cobalt in connection with

---

[10]*Defendant states in its brief that it made this decision "despite the fact it mailed the cancellation notices to Plaintiff's last known address and were otherwise in compliance with the policy provision for cancellation." Defendant's motion, p. 7. In light of the error regarding plaintiff's address, a question exists as to whether defendant had cancelled the policy. The policy provides: "**We** may cancel this policy by mailing or delivering a written notice to the most recent address provided to **us** by **you** as the policy address." Defendant's Exhibit 16, SF-0243. As defendant's claim files reflects that on 12/08/09 "insured came in about cancellation letter," defendant's Exhibit 4, a dispute exists as to whether plaintiff did, in fact, receive the notice.*

plaintiff's January 2010, accident, but would not provide UM coverage. Defendant's Exhibit 12, entry no. 51 (2/10/10 at 4:53 p.m.). Relying on several entries in defendant's claim file,[11] plaintiff argues that defendant resolved the uninsured motorist coverage issue in her favor. [12] Plaintiff ignores an entry made a few hours later the same day.[13] *See id.*

In addition to calling Dunn, Ms. Woods also faxed him a letter on February 10, 2010, stating that per their conversation she was faxing a copy of the form on which plaintiff had rejected UM coverage for the Cobalt, together with letters which instructed the insured on how to obtain a repair estimate for her damaged vehicle. Defendant's Exhibit 17. Ms. Woods testified that she had sent the letters about obtaining an estimate because Dunn had "asked [her] to send in writing how [plaintiff] would be able to present a collision claim for the automobile, what are the steps and procedures."[14] Defendant's Exhibit 18, p. 80. Ms. Woods' letter stated in part:

---

[11]*See plaintiff's response, note 1.*

[12]*Plaintiff cites the entry made at 12:14 p.m. on February 10, 2010, which states: "Agency conceding errors in their office led to this situation. Force coverage and handle." Plaintiff's Exhibit 19, entry no. 47. She disregards a subsequent entry made at 4:53 p.m., which states: Per tm instruction in log 47, forced coverage open. Called atty advised G500 but no U coverage." Id. entry no.51.*

[13]*Donna Gottman, the State Farm employee who made entry no.47,when asked whether "as of February 11, 2010 at 12:42 p.m. State Farm has determined there's coverage on Tabitha Brennan's vehicle?" responded: "That's correct, for the handling of her collision claim." Defendant's Exhibit 19, p. 30.*

[14]*Ms. Woods made an entry in the claims file on February 15, 2010, stating: "I sent Select Service letter and ADSP letter to atty, per his request. Therefore, atty should be aware of the procedures, however, you may want to make contact just to see how insd wants to proceed on getting an estimate on V1." Defendant's Exhibit 12, entry no. 60.*

Also, per your request, we have attached letters which give instruction to the insured on how to obtain an [sic] repair estimate for the damaged vehicle. Ms. Brennan may elect to use our Select Service (TM) program or she can have the damage inspected by a State Farm estimator, at her home, or place of employment. Ms. Brennan's collision deductible is $500. We have not inspected the vehicle, therfore [sic] we need to know if she will use Select Service (TM) Program or if she wants our estimate written by a State Farm Estimator.

Defendant's Exhibit 17. The letter regarding State Farm's Select Service (TM) Program

stated :

In order to complete the repairs, we suggest the following:

1. Contact the repair facility to schedule an appointment for an estimate. Schedule your repairs when the parts are available and the shop can begin the work. Sign an Authorization to Repair with the shop.

2. Monitor the repair process with the shop.

3. Inspect your vehicle at the completion of repairs, and sign an Authorization to Pay when the repairs are competed to your satisfaction.

4. Please pay your $500.00 deductible to the repair facility.

*Id.* The second letter, which explained an insured's other option for having a vehicle

repaired, provided in part:

Attached is our estimate and payment for estimated damages to your vehicle.[15] You have the right to select the repair facility that will repair your vehicle. Only you can authorize repairs to your vehicle.
....
If you have not selected a repair facility, we can assist you by identifying

---

[15]*Woods had sent Dunn a form letter.*

Select Service and/or paintless dent repairers who have agreements with State Farm to provide quality repairs at prices that are competitive in your market area. Conveniently located repairers can also be found by going to www.statefarm.com

*Id.*

Plaintiff contends she had already done what was required to present a property claim, as she had obtained an estimate from Hudiburg Chevrolet, one of defendant's select service providers, and forwarded it to defendant. As mentioned earlier, on January 28, 2010, Dunn faxed defendant a repair estimate for plaintiff's vehicle from Hudiburg Chevrolet along with his letter of representation. Plaintiff's Exhibit 7. Plaintiff also asserts that the provisions pertaining to repair were inapplicable as her vehicle was a total loss.

On February 11, 2010, claim representative Leslie Brondel called Dunn's office. She spoke with his paralegal, who said she would have Dunn return the call. When Dunn did not call back another claim representative, Mike Jones, called his office on February 22, 2010, and left a message. Defendant's Exhibit 12. Dunn did not return the call. Plaintiff offers no explanation for Dunn's failure to return State Farm's calls or respond to State Farm's February 10, 2010, letter other than: "Plaintiff denies such as the Plaintiff's attorney discussed the claim with State Farm as the vehicle was totaled; sent State Farm their select service provider's proof of total, and; State Farm noted that no repairs were set up for the totaled vehicle." Plaintiff's response, pp. 10-11.[16]

---

[16]*The claim file entries plaintiff cites do not reflect that plaintiff's counsel <u>ever</u> discussed with defendant that the car was totaled. In fact they demonstrate the opposite. Defendant's Exhibit 12, entry no. 62 states: "contact ATTY – discuss ADSP and determine how ATTY wants to handle*

On February 11, 2010, Ms. Woods advised one of plaintiff's medical providers that she did not have UM coverage. Plaintiff's Exhibit 25, entry, 53. About a month later, on March 11, 2010, another agent informed another medical provider that while plaintiff's claim was open, there was a signed copy of a UM rejection form in the file. Plaintff's Exhibit 12, entry no. 67. Plaintiff filed this lawsuit on March 15, 2010.

After the lawsuit was filed State Farm inspected plaintiff's vehicle and determined it was a total loss based in part on prior hail damage which was not repaired, but for which State Farm had paid plaintiff. Defendant asserts that without the unrepaired hail damage plaintiff's vehicle would not have been a total loss. Plaintiff disputes this, relying on a damages estimate of $11,078.88 from Blevins Paint & Body. On November 11, 2010, State Farm sent plaintiff a letter stating it was providing her with its claim payment for the total loss of her vehicle and enclosed a check for approximately $5,000. Plaintiff's Exhibits 63, 64.

At some point after this suit was filed (and after the dates of the incidents upon which the bad faith claim is premised), State Farm decided to force coverage on the Lexus and provide plaintiff with UM coverage. Monica Taylor depo. P. 180.

<u>Discussion</u>

The tort of bad faith was first recognized by the Oklahoma Supreme Court in

---

*repairs." Entry no. 63 states: "ADSP paperwork sent to atty this date per his request; pends contact w/ atty to see how the NI wishes to proceed w/ repairs."*

Christian v. American Home Assur. Co., 577 P.2d 899 (Okla. 1978).[17]  It arises from the insurer's implied duty to deal fairly and act in good faith with its insured.  Oulds v. Principal Mut. Life Ins. Co., 6 F.3d 1431, 1436 (10th Cir. 1993).  The insurer does not breach the duty by refusing to pay a claim, if there is a legitimate dispute as to coverage or the amount of the claim and the insurer's position is reasonable and legitimate.  *Id.*  Otherwise put, "[t]he insurer will not be liable for the tort of bad faith if it 'had a good faith belief, at the time its performance was requested, that it had a justifiable reason for withholding payment under the policy.'" *Id*. (quoting McCoy v. Oklahoma Farm Bureau Mut. Ins. Co., 841 P.2d 568, 572 (Okla. 1992).  The insurer's actions are evaluated in light of the facts it knew or should have known at the time it was asked to perform its contractual obligations.  *Id.* at 1437.

Plaintiff has not asserted a breach of contract claim against State Farm.  Nonetheless, to recover for bad faith she must establish that a binding agreement was breached.  Davis v. GHS Health Maint. Org., Inc., 22 P.3d 1204, 1210 & n. 24 (Okla. 2001).  Her alleged losses "must arise from a valid claim." *Id.* at n.24.

Plaintiff alleges that State Farm breached the duty of good faith "by denying the u.m. claim to Tabitha's medical providers after February 10, 2010," and by delaying payment for plaintiff's vehicle.  Plaintiff's response, p. 16.  She asserts "there is no legitimate dispute that coverage was afforded on February 10, 2010 and Tabitha had coverage for the 1-15-10 accident." *Id*.at  p. 17.  Defendant argues that plaintiff rejected UM coverage on the Lexus,

---

[17]*As this is a diversity action the substantive law of the State of Oklahoma applies.*

never provided notice of a UM claim, breached her duty as an insured to cooperate, and cannot establish the required underlying breach of contract.

The court will address the two bases for plaintiff's bad faith claim – the denial of UM coverage and delayed collision coverage – separately.

UM Coverage

Plaintiff's bad faith claim, insofar as it is based on conduct inconsistent with UM coverage, principally hinges on her contention that "coverage was afforded on February 10, 2010." Both parties contend that the undisputed facts support their respective positions: the existence of UM coverage asserted by plaintiff and non-coverage asserted by defendant.[18]

Plaintiff asserts that "[t]he coverage issue was resolved in favor of the Plaintiff as admitted by the Defendant's two claims log entries [nos. 47, 48]." Plaintiff's response, p. 17. Plaintiff is correct that coverage was forced as of that date. However, it was collision coverage, not UM coverage. In other circumstances the entries "[f]orce coverage and handle" and "Policy information has been forced," plaintiff's Exhibit 19, entry nos. 47 and 48, might be construed to include UM coverage, but not here. The undisputed evidence is that less than two hours after entry no. 48 was made, plaintiff's attorney was called and told there was no UM coverage on the Cobalt. Entry no. 51 reflects that conversation. *See* supra note 13.

---

[18]*Plaintiff's motion for partial summary judgment seeks a determination that, as a matter of undisputed fact, she "was afforded u.m. coverage for the January 15, 2010 accident on February 10, 2010." Plaintiff's motion, p. 1.*

Plaintiff's reliance on the testimony of two of defendant's 30(b)(6) witnesses, Whitson and Taylor, to establish the existence of UM coverage is similarly misplaced. While Ms. Whitson did indicate to plaintiff during their first recorded converstation that she had UM coverage, she told her during the second that she did not make coverage decisions. Plaintiff's Exhibit 43.[19]  Plaintiff also disregards Ms. Whitson's subsequent admission that she had been mistaken about the status of plaintiff's account – that plaintiff had not been billed incorrectly and was behind in her payments.  Whitson depo., pp. 78-80.  Ms. Taylor merely testified that State Farm eventually decided to force coverage on the Lexus.

Plaintiff's evidence does not support an inference that State Farm "resolved" the (UM) coverage issue in her favor on February 10, 2010.  Accordingly, she cannot base her bad faith claim on defendant's alleged reversal of that position during its subsequent phone conversations with her medical providers.

Plaintiff also has not shown, as she asserts in her brief,  that she indisputably "did in fact purchase UM coverage."  Plaintiff's response, p. 17.  Coverage under the policy is one of the elements of a bad faith claim, Ball v. Wishire Ins. Co., 221 P.3d 717, 724 (Okla. 2009), and doubts as to an insured's entitlement to policy benefits can be a valid  basis for an insurer's refusal to pay.

Plaintiff asserts defendant issued five documents that prove she bought UM coverage.

---

[19]See also plaintiff' Exhibit 33,  01/18/09,entry ("Insured called to let us know she was involved in accident and the girl did not have insurance.  She wanted to know if she had coverage. I told her I can't answer that but, that she needed to pay first or there for sure would not be coverage.  She said she couldn't pay all of it.").

As noted previously, three of the documents (Exhibit nos. 54, 60, and 61) are irrelevant as they pertain to coverage periods after the date of the collision. *See supra* note 2. The other two documents, a letter dated November 20, 2009 (plaintiff's Exhibit 23) and a declarations page (plaintiff's Exhibit 24), indicate that plaintiff's policy on the Lexus was changed to include UM coverage at the minimum level required by state law, effective November 3, 2009, because plaintiff had not returned a signed UM selection/rejection form. Those documents do not, though, settle the issue.[20] As will be discussed subsequently, questions exist as to whether plaintiff executed a rejection form for the Lexus,[21] whether she ever paid for UM coverage or if, as defendant contends, her policies "were in a canceled status on January 15, 2010, for failure to pay premiums." Defendant's motion, p. 20. Those questions created a legitimate dispute concerning coverage, which bars plaintiff's bad faith claim.

Defendant argues that plaintiff signed forms rejecting UM coverage on both the Cobalt and the Lexus. However, a factual dispute regarding the validity of the form

---

[20]*In support of her argument that coverage exists plaintiff also asserts that "Noelle Whitson also confirmed that she does not see anywhere in State Farm's ABS logs or her agency logs that Tabitha dropped u.m. coverage." Plaintiff's response, p. 17. The issue as to UM coverage on the Lexus appears to be whether plaintiff ever purchased it, not whether she dropped it. Plaintiff's Exhibit 23 indicates the minimum UM coverage allowed under state law was added to plaintiff's policy in November, 2009, because she had not returned a signed UM selection/rejection form. However, there is no evidence plaintiff ever paid the increased premium for the additional coverage and there is evidence to the contrary. See defendant's Exhibit 5.*

[21]*Although unnecessary for the court to decide, if a jury found that plaintiff did execute the rejection form and, therefore, had no valid claim for UM coverage under the Lexus policy, plaintiff could not recover for bad faith as she would not be "entitled to coverage under the insurance policy at issue." Ball, 221 P.3d at 724. While defendant might not be able to rely on the form to demonstrate it acted reasonably because of its late discovery of the document, it could rely on the form to demonstrate that plaintiff did not have a binding agreement that was breached.*

pertaining to the Lexus precludes the court from determining as a matter of law that plaintiff rejected UM coverage on that car. Plaintiff denies she rejected UM coverage on the Lexus,[22] attesting that the form defendant produced, defendant's Exhibit 1, is "a fraudulently altered document." Plaintiff's affidavit. Plaintiff states she requested UM coverage for the Lexus, never checked the box rejecting coverage and "never approved anyone to check the box on [her] behalf." *Id.*[23]

The bottom line is that, to the extent the issue turns on whether plaintiff had UM coverage at the time of the accident, questions of material fact exist which would preclude summary judgment for either party. However, the existence of coverage is not the only potentially determinative issue here. *See* Ball, 221 P.3d at 725 ("If there is a legitimate dispute concerning coverage ... withholding or delaying payment is not unreasonable or in bad faith.").

Notice of UM claim

Regardless of whether plaintiff rejected UM coverage on the Lexus, defendant contends it still is entitled to summary judgment on plaintiff's bad faith claim because she

---

[22]*Both parties have proceeded on the assumption that UM coverage on the Lexus policy, if it existed, would extend to both vehicles.*

[23]*While plaintiff argues that the form was altered, she does not now deny that the signature is hers. She also does not explain what the* underaltered *form included, such as whether she intended to purchase the minimum UM coverage, an amount equal to her bodily injury liability coverage or something in between. In the absence of an executed form, the minimum amount of UM coverage required by statute would have been imputed to plaintiff's policy.* Boerstler v. Hoover, *943 P.2d 614, 616 (Okla. 1997); see defendant's Exhibit 3. The document was signed on December 8, 2009, the date plaintiff went to her insurance agent's office and made the $108 partial payment.*

never made a UM claim before filing suit.  The court agrees.

To make a claim for uninsured motorist coverage under the insurance policy, plaintiff

was required to:

> (1) notify [State Farm] of the claim and give [State Farm] all the details about
> the death, injury, treatment, and other information that [State Farm] may need
> as soon as reasonably possible after the injured *insured* is first examined or
> treated for the injury.  If the *insured* is unable to give [State Farm] notice, then
> any other *person* may give [State Farm] the required notice;
>
> (3) provide written authorization for [State Farm] to obtain:
>
>> (a) medical bills;
>> (b) medical records;
>> (c) wage, salary, and employment
>>    information; and
>> (d) any other information [State Farm] deem
>>    necessary to substantiate the claim.

Defendant's Exhibit 16. SF-0240-41

The undisputed facts establish that plaintiff never advised defendant before she filed

her lawsuit that she was asserting a UM claim.  Providing notice of "the possibility of a U.M.

claim" is not enough.[24]  Plaintiff also has cited no authority that calls from medical providers

inquiring about coverage satisfied the policy's notice requirement.

Duty to cooperate

Even if defendant had notice that plaintiff was seeking UM benefits, defendant

---

[24]*Plaintiff erroneously asserts that "Defendant's own claims log documents that the Plaintiff was making a u.m. claim."  Plaintiff's response, p. 25.  The entry was mistaken, as it merely described the nature of plaintiff's counsel's letter, which did not assert a UM claim.  The letter provided notice of the attorney's lien, the accident "and the possibility of a U.M. claim."  The letter also stated that "[t]o date, we have not determined the status of our client, your insured's, claim." Defendant's Exhibit 10.*

contends plaintiff breached her contractual duty to cooperate by failing to document her UM claim. The court again agrees. Plaintiff's asserts that her attorney did not have the "opportunity to forward the bills prior to suit because the Defendant denied her u.m. claim prior to Plaintiff receiving the medical bills and completing treatment." Plaintiff's response, p. 14. However, State Farm's response to two telephone coverage inquiries did not relieve plaintiff of her obligation to provide defendant with information regarding her injuries or medical treatment needed to substantiate her claim.

Valid Claim and Legitimate Dispute

Defendant asserts that plaintiff cannot establish that a binding agreement was breached because she rejected UM coverage on both vehicles and allowed her policies to lapse by failing to pay the premiums.[25] In February and March, 2010, questions existed as to whether plaintiff had UM coverage,[26] whether her policy was effectively cancelled for nonpayment,[27] and whether she had even made a UM claim. It is those very questions which created a legitimate dispute as to coverage on February 11, 2010, and March 11, 2010, the dates on which plaintiff claims defendant acted in bad faith. Plaintiff has not presented evidence "from which a reasonable jury could conclude that the insurer did not have a

---

[25]*Plaintiff asserts that "prior to the accident, [she] reasonably relied upon Noelle's statements that she had in fact had coverage by making the payments requested by Noelle." Plaintiff's response, p. 22. While her reliance might estop defendant from denying she had some type of coverage, it does not demonstrate defendant's bad faith.*

[26]*See supra note 19.*

[27]*Despite the error regarding plaintiff's mailing address, defendant's records indicated plaintiff received the cancellation letter. Defendant's Exhibit 4.*

reasonable good faith belief" <u>Oulds</u>, 6 F.3d at 1436, that plaintiff did not have UM coverage when it was contacted by her medical providers.

In summary, plaintiff's bad faith claim based on defendant's failure to acknowledge UM coverage fails because plaintiff never made a claim for UM benefits and breached her duty to cooperate by failing to provide defendant with documentation of her claim. It also fails because the undisputed facts show a legitimate dispute existed as to whether plaintiff had any coverage, collision or UM, on February 11, 2010, and March 11, 2010, the dates plaintiff alleges defendant unreasonably denied her claim for UM benefits when it responded to inquiries from her physicians.

Collision claim

Plaintiff claims defendant withheld payment for her property damage claim for over nine months after receiving proof the vehicle was totaled. Plaintiff did attach a repair estimate for the Cobalt to her attorney's notice of representation, which her counsel faxed to defendant on January 27, 2010. However, her attorney subsequently requested information from State Farm on the procedure for presenting a collision claim. The undisputed facts show that State Farm faxed that information to plaintiff's attorney on February 10, 2010, *see* Defendant's Exhibits 17; 18, p. 80, and then called him on February 15, 2010. and February 22, 2010, to determine how he wanted to handle the car repairs. Defendant's Exhibit 12. Plaintiff's counsel never returned the calls.[28]

_____

[28]*There is no evidence in the record indicating plaintiff's counsel informed defendant of prior unrepaired hail damage to the Cobalt, which affected the vehicle's value, or that plaintiff believed*

Although plaintiff argues defendant should have known from the estimate sent that the car was totaled, it is not obvious from that document.[29] Plaintiff has offered no other evidence demonstrating what transpired regarding her collision claim between the date of the accident and November 11, 2010, the date payment was tendered. The only potential evidence of bad faith in the record consists of the length of time before State Farm paid plaintiff for her property loss. However, there is no indication that the delay was attributable to defendant.

The evidence before the court demonstrates that defendant made several attempts to contact plaintiff's counsel regarding her collision claim, but he never responded. Plaintiff not only clearly failed to cooperate with State Farm, she failed to provide the court with evidence, assuming it exists, that defendant was to blame for the lag in payment. She has not shown that a material question of fact exists as to whether defendant acted in bad faith with respect to her property damage claim.

Accordingly, defendant's motion for summary judgment [Doc. #101 ] is **GRANTED** and plaintiff's motion [Doc. #82 ] is **DENIED**.[30]

_____

*the car should be considered totaled.*

*[29]The term "total loss' means that the vehicle repair costs plus the salvage value of the vehicle meets or exceeds the actual cash value of the motor vehicle prior to the loss, as provided in used automobile dealer guidebooks." 36 Okla. Stat. § 1250.8(M).*

*[30]In her motion for summary judgment plaintiff asked the court to make judicial determinations regarding certain facts. It is questionable whether Fed.R.Civ.P. 56 authorizes judicial factfinding in this circumstance, where plaintiff is not seeking summary judgment on a claim*

**IT IS SO ORDERED**.

Dated this 10th day of June, 2011.

JOE HEATON
UNITED STATES DISTRICT JUDGE

---

*or part of a claim, see Fed.R.Civ.P. 56(a);(g), but, in any event, the existence of a material question
of fact precludes the granting of plaintiff's motion.*